J-A12035-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| GRAHAM NICHOLAS NORBY-VARDAC | : | |
| | : | |
| Appellant | : | No. 792 MDA 2020 |

Appeal from the Judgment of Sentence Entered December 11, 2019
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s):  CP-41-CR-0001634-2017

BEFORE:  LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:     **FILED: AUGUST 19, 2021**

Graham Nicholas Norby-Vardac ("Norby-Vardac") appeals from the judgment of sentence imposed following his convictions, at docket number CP-41-CR-0001634-2017 ("1634-2017"), of one count each of first-degree murder, second-degree murder, burglary, robbery, criminal trespass, possession of instrument of crime, criminal mischief, and theft by unlawful

taking; and two counts of aggravated assault.[1, 2] Application to Withdraw granted, and we affirm his judgment of sentence.

In late March 2017, Norby-Vardac left his home in Alexandria, Virginia. Norby-Vardac traveled north, via his bicycle, towards the border between the United States and Canada. In the early morning hours of April 5, 2017, Norby-Vardac arrived in Williamsport, Pennsylvania. Norby-Vardac stopped several individuals, asking for directions to the nearest campground. None of the individuals were able to direct Norby-Vardac to a campground.

Several neighbors saw Norby-Vardac heading towards the home of Donald Kleese, Jr. ("Kleese"). At approximately 1:00 p.m. on April 5, 2017,

---

[1] 18 Pa.C.S.A. §§ 2502(a), (b), 3502(a)(1)(i), 3701(a)(1)(i), 3503(a)(1)(ii), 907(a), 3304(a)(5), 3921(a), 2702(a)(1), 2702(a)(4).

[2] Norby-Vardac filed a single Notice of Appeal listing both 1634-2017 and CP-41-CR-0001635-2017 ("1635-2017"). On June 17, 2020, this Court issued a Rule to Show Cause as to why Norby-Vardac's appeal should not be quashed pursuant to our Supreme Court's decision in *Commonwealth v. Walker*, 185 A.3d 969, 971 (Pa. 2018) (stating that where one order resolves issues on multiple lower court dockets "separate notices of appeal must be filed"). *See* Rule to Show Cause, 6/17/20, at 1. On June 29, 2020, Norby-Vardac filed a Response in which he conceded that his Notice of Appeal did not comply with *Walker* and represented that he would withdraw his appeal at 1635-2017. *See* Response, 6/29/20, at 1-2. On July 15, 2021, this Court issued an Order directing Norby-Vardac to file a notice of appeal at 1635-2017 or withdraw his appeal at 1635-2017. *See* Order, 7/15/21. On July 26, 2021, Norby-Vardac filed an Application to Withdraw his appeal as to 1635-2017, and indicated that none of his claims on appeal relate to 1635-2017. *See* Application to Withdraw, 7/26/21, at 1; *see also* Response, 6/29/21, at 1-2. We grant Norby-Vardac's Application to Withdraw his appeal at 1635-2017, and address the claims raised in his appeal with respect to 1634-2017. We have corrected the caption accordingly.

Christine Mertes ("Mertes"), Kleese's neighbor, noticed that Kleese's vehicle was not at his home. Mertes observed that Kleese's vehicle was still missing at approximately 10:00 p.m. that night.

At approximately 11:00 p.m., Scott Wheeland ("Wheeland"), Kleese's nephew, noticed that Kleese's living room and basement lights were on, which was unusual for that time of night. The next morning, Wheeland observed that the lights were still on, at which time Wheeland called Rachel Campbell ("Campbell"), Kleese's daughter.

At 6:20 a.m., on April 6, 2017, Campbell went to Kleese's home to check on him. When she arrived, she noticed that Kleese's vehicle, a blue Subaru, was missing; the window above the back door had been smashed out; and the door was unlocked. Campbell called out for Kleese, but received no response. Campbell left the house and called her sister, Margaret Bower ("Bower"). Subsequently, when Bower arrived at the scene, the two sisters entered the home. Campbell discovered Kleese's body in the rear bedroom, covered in blood, with his face battered. After Campbell told Bower that Kleese was dead, they went outside and called 911.

Police arrived shortly thereafter and began processing Kleese's home. Police discovered a shovel, covered in blood, lying next to Kleese's body. Police observed that Kleese had significant damage to the head and neck area, and there was a significant amount of blood in those areas of Kleese's body. Additionally, there was blood on the pillows and the end of the mattress. A

bloody pair of pants were lying next to Kleese, with his wallet still inside of the pocket. Additionally, the Police recovered four firearms, including a shotgun, from Kleese's bedroom. Police reported Kleese's blue Subaru as stolen.

At approximately 10:36 a.m, Agent Stephen Habinski ("Agent Habinski"), a customs officer for the Canada Border Service Agency ("CBSA"), conducted an inspection check on Norby-Vardac, who was driving the stolen blue Subaru. Norby-Vardac informed Agent Habinski that he did not have a passport and was going to Canada on business for a few days. Norby-Vardac was unable to identify the city in Canada that he planned to visit, or where he would be staying. Accordingly, Agent Habinski directed Norby-Vardac to pull over to the immigration counter for further questioning.

Agent Doug Hornyak ("Agent Hornyak"), another customs officer for CBSA, was working at the immigration counter. Agent Hornyak informed Norby-Vardac that, due to his lack of money and employment, he may be denied entry into Canada. Agent Hornyak asked Norby-Vardac how he had traveled to the border, and Norby-Vardac responded that he had borrowed his grandfather's car. Agent Hornyak searched the vehicle and recovered the vehicle's registration showing that Kleese was the owner. At this time, Agent Hornyak learned that the blue Subaru was stolen. Agent Jordan Richards ("Agent Richards"), another customs officer for CBSA, arrested Norby-Vardac. Agent Richards asked Norby-Vardac if he should be concerned for the owner of the vehicle, to which Norby-Vardac responded that "no one was supposed

to be in there."  Norby-Vardac was subsequently turned over to the Buffalo Police Department.

Buffalo Police Officer Scott Malec ("Officer Malec") questioned Norby-Vardac about the blue Subaru.  Norby-Vardac claimed he had found it in the middle of Pennsylvania, in an area with few houses.  According to Norby-Vardac, the vehicle was abandoned and the keys were lying nearby.  Norby-Vardac informed Officer Malec that he had been biking for days, from Virginia, and was attempting to meet someone in Canada.

Next, Norby-Vardac told Officer Malec that although he knew of Kleese's house, he did not enter the house because it looked abandoned.  However, after a few more minutes of questioning, Norby-Vardac admitted that he had broken the back window with a shovel and forced his way into Kleese's home.  At this point, Norby-Vardac claimed that he took the car keys and left immediately thereafter.  However, upon further questioning, Norby-Vardac admitted that he had searched the entire house for food.  Officer Malec asked Norby-Vardac to describe how Kleese died, to which Norby-Vardac responded that Kleese was already dead when Norby-Vardac had entered the home.

After a couple more minutes of questioning, Norby-Vardac stated that, at approximately 8:30 a.m. on April 5, 2017, after he had entered Kleese's home, Norby-Vardac found Kleese holding a shotgun, and that Kleese attempted to shoot Norby-Vardac, but missed.  According to Norby-Vardac, he then knocked the shotgun out of Kleese's hands and hit Kleese in the head

with a shovel to prevent him from for reaching for another weapon. Norby-Vardac told Officer Malec that he did not intend to kill anyone.

On April 7, 2017, Pennsylvania State Police ("PSP") Troopers Rob Reeves ("Trooper Reeves") and Daniel Switzer ("Trooper Switzer") arrived at the Buffalo Police Department to interview Norby-Vardac. Norby-Vardac detailed a similar series of events to Troopers Reeves and Switzer. In particular, Norby-Vardac explained that he had been traveling from Virginia to Canada, via bicycle, in order to meet with someone. According to Norby-Vardac, he had asked several individuals for help in Williamsport, but no one helped him. In regard to Kleese, Norby-Vardac explained that he had panicked upon discovering that someone was in the house, and that he did not want to kill Kleese. At this time, Norby-Vardac further admitted to strangling Kleese, after hitting him with the shovel, because Norby-Vardac did not want Kleese to call the police.

Subsequently, upon conducting an inventory search of the blue Subaru, PSP recovered various articles belonging to Norby-Vardac including a ski mask, laundry bag, sleeping bag, and a jar of change. The PSP also performed a DNA swab on Norby-Vardac's fingernails, which was sent for DNA analysis along with numerous items from Kleese's house including, but not limited to the shovel, an orange jacket found next to Kleese, pillows, bedsheets, and the bloody pants.

The PSP Forensic DNA Division performed a DNA analysis on, *inter alia*, the above-mentioned items. Kleese's DNA was found on the handle and head of the shovel, as well as on a long-sleeve shirt that Norby-Vardac had worn. A mixture of DNA, comprised mostly of Kleese's DNA, was found on Norby-Vardac's pants.

Samuel Land, M.D. ("Dr. Land"),[3] performed the autopsy on Kleese. Dr. Land concluded that Kleese suffered blunt force trauma to his head and neck, as a result of "chop wounds" from a sharp-edged, heavy object. Additionally, Dr. Land concluded that such wounds, consistent with the use of a shovel, were sufficient to cause death. Dr. Land further explained that Kleese had suffered wounds to his neck area including, *inter alia*, a fractured hyoid bone, which could have been caused via strangulation or by blunt force trauma to the neck. Dr. Land determined that such neck wounds were sufficient to cause death. Additionally, Dr. Land noted that Kleese had several defensive wounds on his hands and arms. Ultimately, Dr. Land opined that Kleese's manner of death was homicide, caused by blunt force trauma to the head and neck.

On April 11, 2017, the Commonwealth charged Norby-Vardac with, *inter alia*, the above-mentioned offenses. On June 7, 2017, the trial court ordered John K. Northrop, M.D. ("Dr. Northrop"),[4] to conduct a competency evaluation

---

[3] Dr. Land is a forensic pathologist and works for Health Network Laboratories in Allentown, Pennsylvania.

[4] Dr. Northrop is an expert in the fields of psychiatry and neurology.

of Norby-Vardac. On July 1, 2017, Dr. Northrop met with and interviewed Norby-Vardac, and thereafter issued his July 9, 2017, report indicating that Norby-Vardac was competent to stand trial.

Norby-Vardac hired his own expert, Pogos H. Voskanian, M.D. ("Dr. Voskanian"),[5] who interviewed and evaluated Norby-Vardac for competency. On November 15, 2017, Norby-Vardac filed a Notice of Defense of Insanity or Mental Infirmity and Notice of Expert Evidence as to Mental Condition ("Notice of Insanity Defense"), in which he argued, *inter alia*, that Dr. Voskanian had diagnosed Norby-Vardac with Autistic Spectrum Disorder and Schizophrenia. Additionally, Norby-Vardac asserted, Dr. Voskanian concluded that Norby-Vardac was not competent to stand trial.

Additionally, on November 15, 2017, Norby-Vardac filed an Omnibus Pre-Trial Motion in which he argued, *inter alia*, that he was not competent to stand trial, and requested a competency hearing based upon Dr. Voskanian's and Dr. Northrop's findings.

On February 28, 2018, based upon Norby-Vardac's request for a competency hearing, the Commonwealth filed a Motion for Continuance, in which it requested time to retain another expert to evaluate Norby-Vardac's competency. The trial court granted the Commonwealth's Motion, and the

---

[5] Dr. Voskanian is an expert in the fields of psychiatry and forensic psychiatry.

Commonwealth retained John Sebastian O'Brien, II, M.D. ("Dr. O'Brien"),[6] as its expert. On June 18, 2018, Dr. O'Brien interviewed Norby-Vardac, and subsequently issued an expert report indicating that Norby-Vardac was competent to stand trial.

On August 30, 2018, the trial court conducted a pre-trial Competency Hearing to determine whether Norby-Vardac was competent to stand trial, after which the parties submitted briefs. On October 16, 2018, the trial court determined that Norby-Vardac was competent to stand trial and denied Norby-Vardac's Omnibus Pre-Trial Motion.

After additional pre-trial matters not relevant to the instant appeal, Norby-Vardac proceeded to a bench trial on June 24, 2019, June 27, 2019, and December 11, 2019.[7] On December 11, 2019, at the conclusion of the bench trial, the trial court convicted Norby-Vardac of the above-mentioned offenses. That same day, the trial court sentenced Norby-Vardac to an aggregate term of life in prison.

_____

[6] Dr. O'Brien is an expert in the fields of psychiatry and forensic psychiatry.

[7] The gap between June 27, 2019, and December 11, 2019, was caused by Dr. Land's unavailability until December.

On December 23, 2019, Norby-Vardac filed a Post-Sentence Motion[8] and, on February 3, 2020, Norby-Vardac filed a Supplemental Post-Sentence Motion. In his Motions, Norby-Vardac argued, *inter alia*, that the trial court erred in determining that Norby-Vardac was competent to stand trial; the evidence was insufficient to sustain convictions of first-degree murder, second-degree murder, robbery, and burglary; the trial court erred by not finding Norby-Vardac guilty but mentally ill; and that trial court erred in precluding Marlys Norby ("Marlys"), Norby-Vardac's mother, from testifying about Norby-Vardac's mental condition. After a hearing, the trial court denied Norby-Vardac's Post-Sentence Motions.

Norby-Vardac filed a timely Notice of Appeal and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal.

Norby-Vardac raises the following claims for our review:

1. Whether the trial court erred in determining [that Norby-Vardac was] competent to proceed to trial?

2. Whether the trial court erred in finding sufficient evidence to establish [that Norby-Vardac was] guilty of first[-]degree murder, second[-]degree murder, robbery and burglary?

3. Whether the trial court erred in failing to find [Norby-Vardac] guilty but mentally ill?

---

[8] We note that Norby-Vardac's Post-Sentence Motion was due on December 21, 2019, a Saturday, and accordingly, his Post-Sentence Motion was timely filed. **See** 1 Pa.C.S.A. § 1908 (providing that "[w]henever the last day of any such time period shall fall on a Saturday or Sunday … such day shall be omitted from the computation.").

- 10 -

4. Whether the trial court erred in sustaining objections by the Commonwealth to [Marlys] testifying as to [Norby-Vardac]'s mental health treatments and conditions?

Brief for Appellant at 8 (issues re-ordered).

In his first claim, Norby-Vardac contends that he was not competent to stand trial, because he was unable to assist in his own defense. *Id.* at 14-15. Norby-Vardac acknowledges that all three expert reports indicated that Norby-Vardac was capable of understanding the nature and object of the proceedings. *Id.* However, Norby-Vardac points to Dr. Voskanian's expert report, which indicates that Norby-Vardac "lives in a fantasy world [that] affect[s] his ability to communicate with his attorney." *Id.* at 15-16. Norby-Vardac acknowledges that the record indicates he can understand, *factually*, the *nature* of the charges and proceedings; however, Norby-Vardac argues that he cannot rationally understand the charges and proceedings. *Id.* at 16-17. Norby-Vardac claims that his "ability" to drift between the real world and his fantasy worlds demonstrates that he is not capable of rationally understanding the proceedings, which prevents him from assisting in his own defense. *Id.* at 16-18. Norby-Vardac asserts that all three of the experts diagnosed him with severe mental health issues, and accordingly, he was not competent to stand trial. *Id.* at 17-18.

Our standard of review of a trial court's ruling on competency is for abuse of discretion. *Commonwealth v. Delbridge*, 859 A.2d 1254, 1257 (Pa. 2004). Our scope of review is plenary, and this Court may review the

entire record in making its decision.  ***Id.***  When reviewing a competency claim, we are guided by the following principles:

> A defendant is presumed competent and it is his burden to show otherwise, the determination of which is within the sound discretion of the trial court.  When a competency hearing takes place, incompetency may be established by a preponderance of the evidence.  The sensitive nature of competency determinations requires the appellate courts to afford great deference to the conclusions of the trial court, which has had the opportunity to observe the defendant personally.  When the record supports the trial court's determination, we will not disturb it.

***Commonwealth v. Stevenson***, 64 A.3d 715, 720 (Pa. Super. 2013) (citations omitted).

> Pennsylvania's definition of incompetence is statutory:
>
> [W]henever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

50 P.S. § 7402(a).  In order to establish incompetence, an appellant has the burden of proving he was either unable to understand the nature of the proceedings against him or to participate in his own defense. ***Commonwealth v. Santiago***, 855 A.2d 682, 694 (Pa. 2004).

Instantly, the trial court, in its Opinion and Order, summarized the Competency Hearing expert testimony and the expert reports, which we incorporate fully herein by reference.  ***See*** Trial Court Opinion, 10/16/18, at 2-8.  Additionally, our review of the record confirms the trial court's determinations regarding Norby-Vardac's competency, and its legal conclusion

is sound. We therefore affirm on the basis of the trial court's Opinion with regard to this claim. ***See id.*** at 2-11.

In addition, we note the following. A key consideration of competency hearings is whether the defendant is competent *at the time* of trial. ***See Stevenson***, ***supra***. Instantly, Dr. O'Brien and Dr. Northrop indicated that Norby-Vardac's competency was improving since the start of his pre-trial incarceration. ***See*** Dr. O'Brien's Evaluation, 8/20/18, at 13-14; Dr. Northrop's Evaluation, 7/9/17, at 19. Further, Dr. Voskanian indicated that Norby-Vardac's medications have made him calmer, easier to speak with, and have aided in his competency. ***See*** N.T. (Competency Hearing), 8/30/18, at 6. Thus, the record does not support Norby-Vardac's claim. ***See Stevenson***, ***supra***.

In his second claim, Norby-Vardac argues that the Commonwealth failed to present sufficient evidence to sustain his convictions of second-degree murder, robbery, burglary, and first-degree murder. Brief for Appellant at 16-17. In regard to second-degree murder, Norby-Vardac contends that the Commonwealth failed to provide sufficient evidence that a felony was in progress at the time that Norby-Vardac killed Kleese. ***Id.*** at 19-20. In particular, Norby-Vardac argues that the only evidence is his own confession, in which he stated his belief that the house was abandoned. ***Id.*** at 20.

Regarding robbery, Norby-Vardac asserts that there is no evidence that anything was stolen from the house, nor that Norby-Vardac had attempted to steal anything from the house. *Id.*

With regard to burglary, Norby-Vardac argues that the Commonwealth failed to establish that he had the intent of committing any crime when he entered Kleese's home. *Id.* at 20-21. Norby-Vardac contends that, at the time he entered Kleese's home, "he was starving, exhausted, and in need of help." *Id.* at 21. Further, Norby-Vardac believed that the building was abandoned. *Id.* Norby-Vardac claims that the Commonwealth did not present any eye-witness testimony, or any other evidence aside from Norby-Vardac's confession. *Id.*

In regard to first-degree murder, Norby-Vardac argues that none of the Commonwealth's witnesses saw him kill Kleese. *Id.* at 17-18. Additionally, Norby-Vardac claims that his own confession, which the Commonwealth used to show intent, only amounted to "panic and fear … [which] would qualify for [] murder of the third degree," not first degree. *Id.* at 18-19.

When considering a challenge to the sufficiency of the evidence, we determine

> whether[,] viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be

- 14 -

resolved by the fact-finder[,] unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, or part or none of the evidence.

*Commonwealth v. Melvin*, 103 A.3d 1, 39-40 (Pa. Super. 2014) (citation omitted).

Norby-Vardac raises four sufficiency challenges. *See* Brief for Appellant at 16-21. We will address Norby-Vardac's sufficiency claims with regards to burglary, robbery,[9] and second-degree murder together, as they are related.

The Crimes Code defines burglary, in relevant part, as follows:

**§ 3502. Burglary**

**(a) Offense defined.—**A person commits the offense of burglary if, with the intent to commit a crime therein, the person:

(1)(i) enters a building or occupied structure, or separately secured or occupied portion thereof, that is adapted for overnight accommodations in which at the time of the offense any person is present and the person commits, attempts or threatens to commit a bodily injury crime therein

---

[9] We observe that Norby-Vardac's argument, with regards to his robbery conviction, is devoid of any citation to relevant legal authority or case law. *See* Pa.R.A.P. 2119(a) (requiring an appellant to support his argument with "such discussion and citation of authorities as are deemed pertinent."). Nevertheless, we decline to find Norby-Vardac's claim waived, because it is strongly intertwined with his sufficiency challenge regarding second-degree murder.

18 Pa.C.S.A. § 3502(a)(1)(i). Additionally, "[i]t is a defense to prosecution for burglary if[,] … at the time of the commission of the offense[,] … [t]he building or structure was abandoned." 18 Pa.C.S.A. § 3502(b)(1); *see also Commonwealth v. Henderson*, 419 A.2d 1366, 1367 (Pa. Super. 1980) (explaining that an abandoned structure is one that has been "wholly forsaken or deserted" and cannot be proven merely because a building is uninhabited; evidence that the build or structure is being maintained is enough to render the defense of abandonment inapplicable). A "bodily injury crime" is defined as "[a]n act, attempt or threat to commit an act which would constitute a misdemeanor or felony under … Chapter 25 (relating to criminal homicide)[,] Chapter 27 (relating to assault)[, or] … Chapter 37 (relating to robbery)." 18 Pa.C.S.A. § 3502(e)(1).

Regarding robbery, in relevant part, the Crimes Code provides that a "person is guilty of robbery if, in the course of committing a theft, he … inflicts serious bodily injury upon another[.]" 18 Pa.C.S.A. § 3701(a)(1)(i).

Further, as to second-degree murder, in relevant part, the Crimes Code provides that "[a] criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S.A. § 2502(b). For the purposes of second-degree murder, a "felony" is defined as, *inter alia*, robbery or burglary. 18 Pa.C.S.A. § 2502(d). "[While] first-degree murder requires a specific intent to kill (actual malice), the malice essential to the crime of

second-degree murder is imputed to the defendant from the intent to commit the underlying felony, regardless of whether the defendant actually intended to physically harm the victim." **Commonwealth v. Mikell**, 729 A.2d 566, 569 (Pa. 1999).

Instantly, the record, viewed in the light most favorable to the Commonwealth, reveals that Norby-Vardac, *en route* to Canada on his bicycle, arrived in Williamsport in search of food and shelter. N.T. (Bench Trial), 12/11/19, at 38; N.T. (Bench Trial), 6/27/19, at 43. After a couple of hours, Norby-Vardac came upon Kleese's home and broke the back window with a shovel. N.T. (Bench Trial), 6/27/19, at 42-43. Norby-Vardac entered the home with the intent to find and take food and money. **Id.** at 11 (wherein Commonwealth Exhibit 55, Officer Malec's interview of Norby-Vardac, was entered into evidence); **see also** Commonwealth Exhibit 55, at 20:01:55 (wherein Norby-Vardac told Officer Malec that he broke into Kleese's house with a shovel in order to look for food and money). However, Norby-Vardac encountered Kleese in the home, who aimed a shotgun at Norby-Vardac. N.T. (Bench Trial), 6/27/19, at 42-43; **see also** Commonwealth Exhibit 55, at 20:30:00 (wherein Norby-Vardac described Kleese holding a shotgun and firing it at Norby-Vardac). Norby-Vardac disarmed Kleese, hit him in the head and neck with a shovel, and then strangled Kleese until he died. **See** Commonwealth Exhibit 55, at 20:03:00 – 20:38:35 (wherein Norby-Vardac explained that he disarmed Kleese, hit him in the head with a shovel, then

strangled Kleese); *see also* N.T. (Bench Trial), 6/27/19, at 36 (wherein Commonwealth Exhibit 57A was admitted into evidence); Commonwealth Exhibit 57A, at 12:33:45-13:12:00 (wherein Norby-Vardac told Trooper Reeves that he broke into Kleese's home with a shovel, hit Kleese in the head after disarming him, and strangled Kleese). Afterwards, Norby-Vardac searched Kleese's home, and ultimately stole Kleese's car keys, car, and various coins. Commonwealth Exhibit 55 at 20:39:00; Commonwealth Exhibit 57A at 13:12:00.

Based upon the foregoing, the Commonwealth presented sufficient evidence to sustain Norby-Vardac's convictions of burglary, robbery, and second-degree murder. In particular, the evidence established that Norby-Vardac had entered the home with the intent to take money and food from the house. Commonwealth Exhibit 55 at 20:01:55; Commonwealth Exhibit 57A at 12:33:45-13:12:00; *see Henderson*, *supra*; *see also Henderson*, 419 A.2d at 1368 (stating that because the "defense of abandonment has no mental element," a mistake of fact regarding whether a building or structure has been abandoned is irrelevant to the defense of abandonment"). Additionally, the evidence established that, upon entering Kleese's home, Norby-Vardac caused significant bodily harm to Kleese in the furtherance of acquiring these items. N.T. (Bench Trial), 6/27/19, at 42-43; Commonwealth Exhibit 55 at 20:03:00–20:38:35; *see also* 18 Pa.C.S.A. § 3701(a)(1)(i). Indeed, Norby-Vardac struck Kleese on the head and neck with a shovel,

before strangling Kleese and fracturing his hyoid bone, which resulted in Kleese's death. 18 Pa.C.S.A. § 2502(b), (d); *see Mikell*, *supra*. Because, the Commonwealth presented sufficient evidence to sustain Norby-Vardac's convictions of burglary, robbery, and second-degree murder, we cannot grant him relief on these claims. *See Melvin*, *supra*.

As to Norby-Vardac's challenge to the sufficiency of the evidence underlying his conviction of first-degree murder, the Crimes Code provides that "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a). Our Supreme Court has stated that in order "[t]o convict a defendant of first[-]degree murder, the Commonwealth must prove: [(1)] a human being was unlawfully killed; [(2)] the defendant was responsible for the killing; and [(3)] the defendant acted with malice and a specific intent to kill. *Commonwealth v. Houser*, 18 A.3d 1128, 1133 (Pa. 2011) (internal citations omitted).

A killing is intentional if it is done in a "willful, deliberate and premediated fashion." 18 Pa.C.S.A. § 2502(d). The period of reflection needed to establish deliberation and premeditation may be as brief as a fraction of a second. *Commonwealth v. Rivera*, 983 A.2d 1211, 1220 (Pa. 2009). Indeed, the deliberation and premeditation needed to establish intent exist whenever the assailant possesses the conscious purpose to bring about death. *Id.* The Commonwealth may use circumstantial evidence to establish the elements of first-degree murder, including the element of intent. *Id.*

Regarding the element of intent, we observe the following:

When there is no direct evidence of intent to kill, the fact-finder may glean the necessary intent from the act itself and from all surrounding circumstances. **Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another. Death caused by strangulation is sufficient to infer the specific intent required for a conviction of first**[-]**degree murder.**

*Commonwealth v. Hawkins*, 701 A.2d 492, 500 (Pa. 1997) (citations omitted; emphasis added).

Our review of the record reveals that each of the elements of first-degree murder was established beyond a reasonable doubt. As described above, the evidence established that Norby-Vardac struck Kleese in the head and neck with a shovel, and then strangled him until he died. *see Hawkins*, *supra*. It is without contest that Kleese died as a result of these injuries, and that both the shovel strike and subsequent strangling were performed on vital parts of Kleese's body. *See Rivera*, *supra*. Accordingly, the Commonwealth presented sufficient evidence to sustain Norby-Vardac's conviction of first-degree murder and we can grant him no relief.

In his third claim, Norby-Vardac contends that the trial court erred when it failed to find him guilty but mentally ill. Brief for Appellant at 23-24.

Section 314 of the Crimes Code, in relevant part, provides as follows:

**(a) General rule.--**A person who timely offers a defense of insanity in accordance with the Rules of Criminal Procedure may be found "guilty but mentally ill" at trial if the trier of fact finds, beyond a reasonable doubt, that the person is guilty of an offense, was mentally ill at the time of the commission of the offense and

was not legally insane at the time of the commission of the offense.

* * *

**(c) Definitions.--**For the purposes of this section …:

(1) "***Mentally ill***." One who as a result of mental disease or defect, lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.

(2) "***Legal insanity***."  At the time of the commission of the act, the defendant was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know he was doing what was wrong.

18 Pa.C.S.A. § 314(a), (c)(1)-(2).

"Under Section 314(a), a defendant who pleads not guilty may be found by a fact-finder to be guilty but mentally ill *only if the defendant 'offers a defense of insanity*.'"  ***Commonwealth v. Andre***, 158 A.2d 1260, 1263-64 (Pa. Super. 2017) (emphasis added; citations omitted).  "The reason for this rule is that, under Pennsylvania law, mental illness is not a defense to criminal liability unless the mental illness rises to the level of legal insanity under Section 314(c)(2)."  ***Andre***, 158 A.2d at 1264 (emphasis omitted).

Section 315(a) of the Crimes Code provides that "[t]he mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense."  18 Pa.C.S.A. § 315(a).

Instantly, in its Order and Opinion denying Norby-Vardac's Post-Sentence Motions, the trial court addressed this claim as follows:

[Norby-Vardac] filed a timely Notice of [Insanity Defense] in compliance with Pa.R.Crim.P. 568 on November 15, 2017. In that [N]otice, [Norby-Vardac] stated "[Dr.] Voskanian's conclusion regarding the mental state at the time of the offense is that [Norby-Vardac] was under extreme duress and lacked the capacity to form a specific intent to kill." [Notice of Insanity Defense, 11/15/17, at 2.] Additionally, Eric Vardac ([Norby-Vardac]'s father) and Marlys were listed as individuals [Norby-Vardac] intended to call []in support of Dr. Voskanian's conclusions.[] As noted in [the trial c]ourt's Order granting [Norby-Vardac]'s Motion to Reconsider precluding [Dr.] Voskanian's testimony at trial, [Dr.] Voskanian **did not reach a conclusion as to an insanity defense**. Order[,] 8/7/19, at 1. In his report, [Dr.] Voskanian specifically stated that he **could not**, "**opine regarding an insanity defense.** However, based on the date contained in this report, it is my opinion, to a reasonable degree of medical certainty, that [Norby-Vardac] was under extreme duress (in light of his mental illness) and lacked the capacity to form a specific intent to kill." Defendant Exhibit #2, at 35[; **see** N.T. (Competency Hearing), 8/30/19, at 29 (wherein Dr. Voskanian's expert report was entered into evidence).] A diminished capacity defense is "an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill." **Commonwealth v. Hutchinson**, 25 A.3d 277, 312 (Pa. 2011). This is not the same as raising an insanity defense as they are two separate principals of law, [and] Dr. Voskanian] verified [that] he could not reach a conclusion as to insanity. Since a defense of insanity was never raised, it would have been improper to allow Marlys to testify regarding [Norby-Vardac]'s mental condition, as it was irrelevant and it would have been similarly improper to find [Norby-Vardac] guilty, but mentally ill.

Trial Court Order and Opinion, 5/8/20, at 20-21 (emphasis added).

Our review of the record confirms the trial court's determinations. Because Norby-Vardac failed to raise, let alone establish the defense of

insanity, the trial court could not find him guilty but mentally ill. **See Andre**, 158 A.2d at 1263-64 (stating that a defendant may be found guilty but mentally ill only if he "offers a defense of insanity"). Accordingly, we cannot grant Norby-Vardac relief on this claim.

In his fourth claim, Norby-Vardac contends that the trial court erred when it sustained the Commonwealth's objections and prohibited Marlys from testifying as to Norby-Vardac's mental health treatments and conditions. **Id.** at 21-23. In particular, Norby-Vardac argues that Marlys's testimony was relevant, because it would have aided the trial court in finding Norby-Vardac guilty but mentally ill. **Id.** at 22.

Relevance is the threshold for admissibility of evidence. **Commonwealth v. Cook**, 952 A.2d 594, 612 (Pa. 2008). Pursuant to Pennsylvania Rule of Evidence 401, evidence is relevant if "(a) it has the tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Drumheller**, 808 A.2d at 904. "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Thus, while the general rule of the admissibility of relevant evidence is subject to various exceptions, the rule that irrelevant evidence is

- 23 -

not admissible is categorical. Accordingly, [t]he threshold inquiry with admission of evidence is whether the evidence is relevant." ***Commonwealth v. Cook***, 952 A.2d 594, 612 (Pa. 2008) (internal quotations and citations omitted).

Instantly, as discussed above, Norby-Vardac did not preserve a defense of insanity, and the trial court was therefore prohibited from finding Norby-Vardac guilty but mentally ill. ***See*** Trial Court Order and Opinion, 5/8/20, at 20-21; ***see also Andre***, ***supra***; 18 Pa.C.S.A. § 314(a). Therefore, Marlys's testimony would not have been relevant to assist the trial court in finding Norby-Vardac guilty but mentally ill, and accordingly, this claim lacks merit. ***See*** Pa.R.E. 402; ***see also Andre***, ***supra***; ***Drumheller***, ***supra***.

Application to Withdraw granted. Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/19/2021

- 24 -

**IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA          :
                                       :          CP-41-CR-1634-2017
                    v.                 :
                                       :
GRAHAM N. NORBY-VARDAC,                 :          COMPETENCY
                    Defendant           :          DETERMINATION

### OPINION AND ORDER

On April 7, 2017, Graham Norby-Vardac (Defendant) was interviewed and charged by the Pennsylvania State Police with one count of Criminal Homicide,[1] two counts of Aggravated Assault,[2] one count of Burglary,[3] one count of Robbery,[4] one count of Criminal Trespass,[5] one count of Possession of an Instrument of a Crime,[6] one count criminal mischief,[7] and one count of Theft by Unlawful Taking.[8] The charges arise out of Pennsylvania State Police being dispatched to the home of Donald Kleese Jr. for a report of a deceased body. Upon arrival, they found Victim dead in his bedroom bloody around his arms, neck, and head from an apparent break-in and attack. In addition, Victim's vehicle was missing. Contemporaneously, Defendant was detained at the Canadian border driving Victim's missing vehicle with blood on his clothing and a black eye. Defendant filed a timely Omnibus Pretrial Motion on November 15, 2017, which was seeking to suppress evidence and declare Defendant incompetent. The Motion to Suppress Evidence was later withdrawn and a hearing was held on Defendant's competency, August 30, 2018.

---

[1] 18 Pa. C.S. § 2501(a).
[2] 18 Pa. C.S. § 2702(a)(1), (4).
[3] 18 Pa. C.S. § 3502(a)(1)(i).
[4] 18 Pa. C.S. § 3701(a)(1)(i).
[5] 18 Pa. C.S. § 3503(a)(1)(ii).
[6] 18 Pa. C.S. § 907(a).
[7] 18 Pa. C.S. § 3304(a)(5).
[8] 18 Pa. C.S. § 3921(a).

SCANNED

**Testimony and Expert Reports**

To date Defendant has had three separate medical evaluations by different professionals/experts in the field. One was conducted by Dr. Pogo Voskanian at request of defense counsel on October 4, 2017. One was ordered by this Court on June 7, 2017 and was conducted by Dr. John K. Northrop on July 1, 2017. The third was undertaken by the Commonwealth and conducted by Dr. John O'Brien on June 18, 2018. Both Dr. O'Brien and Dr. Voskanian testified at the Competency Hearing on August 30. 2018.

Although the three interviews revealed similarities, all three received an almost identical recitation of the events around the time of the incident. Defendant stated he was traveling north to Canada on his bicycle following the GPS on his phone. When he reached Williamsport he was exhausted, hungry, and tired. He broke a window with a shovel to gain entry into a house he thought was abandoned. When he entered the house he discovered a dead body in one of the bedrooms. Instead of calling the police he took some coins and the keys to an old car outside. He then took off to Canada in the vehicle, before being stopped at the Canadian border.

### *Dr. Pogo Voskanian's Report and Testimony*

Dr. Voskanian issued a report stating his medical opinion and conclusion as to Defendant's competency to stand trial. This report was based off his two and a half (2 ½) hour interview of Defendant on October 4, 2017, interviews with both of his parents, and a number of documents relating to this incident and Defendant's history. Dr. Voskanian's Evaluation 10/17/17, at 1. During Dr. Voskanian's discussion with Defendant regarding his childhood, he stated that he was "bullied a lot" and that he had no friends because he was shy and insecure. *Id.* at 5. Defendant also talked about his alternate world, which he stated he was in at that

2

moment. *Id.* This reality is "disappointing [and] dull" and he has never had physical contact or had a girlfriend, but in his personal reality he has a girlfriend, his "twin soul," he is not human, and he can remember all of his past lives. *Id.*

Regarding education, Defendant attended many private schools before graduating from a school for people with special needs. *Id.* at 6. After graduating he attended Northern Virginia Community College for a few semesters, but did poorly, would often get into fights and was bullied. *Id.* When he was eleven (11) or twelve (12) his parents divorced and he stated his stepfather abused him. *Id.* He worked sporadically, but had difficulty holding down a job. *Id.* Defendant was diagnosed early on in his childhood with autistic disorder. *Id.* at 25. In September of 2000, he was diagnosed with ADHD. *Id.* As a result of his condition he would often act impulsively and aggressive in nature. *Id.* At the age of eighteen Defendant began experiencing auditory hallucinations. *Id.*

In Dr. Voskanian's diagnostic opinion, a diagnosis of Autistic Disorder was correct at an early age as he meets the criteria. *Id.* at 32. He similarly diagnoses Defendant with Autistic Spectrum Disorder. *Id.* at 33. This is evidenced by his narrow range of interests, not being able to form friendships, impaired social functioning, and "hyperactivity to sensory input, such as sensitivity to noise and acting out violently when stimulated." *Id.* at 32. Dr. Voskanian also diagnosed Defendant with schizophrenia due to his auditory hallucinations. *Id.* at 33.

As for Defendant's competency to stand trial, Dr. Voskanian finds that he has an acceptable factual understanding of the proceedings. *Id.* He understands the roles of the parties, attorneys, and judge and understands the process of being found guilty. *Id.* But, in Dr. Voskanian medical opinion, he lacks the rational capacity to be considered competent to stand

trial because he would not be able to assist his attorney in his defense. *Id.* "Defendant's reality testing is severely impaired. He is looking for an escape from his current circumstances into his reality." *Id.* Dr. Voskanian again interviewed Defendant for an hour prior to the hearing on August 30, 2018 and was not changed in his opinion, although he believes the medication is making him more docile and easier to communicate with. Dr. Voskanian testified that he believes Defendant to be highly suggestible and cannot separate fantasy from reality. Also Dr. Voskanian thinks his diagnosis is why Defendant fixates on the fact there is no fingerprints on the shovel and therefore he cannot be found guilty.

### Dr. John O'Brien's Report and Testimony

Dr. O'Brien created a report stating his medical opinion and conclusion as to Defendant's competency to stand trial. This report was based off of his interview of Defendant that lasted one (1) hour and forty-five (45) minutes on June 18, 2018, and his review of the documents relating to this incident and Defendant's history. Dr. O'Brien's Evaluation 08/20/18, at 1. During their interview, Defendant described his childhood as "O.K." but states that his stepfather was very abusive. *Id.* at 14. Defendant told Dr. O'Brien he suffered from autism. *Id.*

Defendant stated he was in a few different schools and was in special education classes. *Id.* He attended Northern Virginia Community College but was a "relatively poor student" and he had sporadic employment. *Id.* at 14-15. When asked about what difficulties stemmed from his diagnosis of autism, Defendant stated difficulty making friends and concentrating. *Id.* at 15. He additionally stated he enjoyed living on his own and cooking and providing for his own needs. *Id.* Defendant indicated that he would often meditate and indulge in fantasy. *Id.* at 16. Dr. O'Brien indicated that his thoughts during these meditation

4

periods were to be considered psychotic symptoms, including "auditory hallucinations and grandiose ideations." *Id.* at 17. During incarceration, Defendant felt as though he would have "mood swings privately," but had not acted out violently since arriving and being place "in the hole" because he did not wish to have that happen again. *Id.*

Defendant also brought up his "twin flame" which was something that only occurred during meditation. *Id.* Dr. O'Brien stated that Defendant "demonstrated an intact understanding of his current pending criminal charges and potential outcomes of his prosecution." *Id.* Defendant outlined his potential legal options and identified his attorney by name. *Id.* Dr. O'Brien described Defendant as "interactive, sociable, communicative, and demonstrated an intact ability to listen to, comprehend, and respond appropriately to questions posed to him." *Id.* at 18. Additionally, Dr. O'Brien concluded Defendant did not "exhibit any impairment in his ability to communicate reasonably, rationally, and responsively to his attorney." *Id.*

Based on this, Dr. O'Brien reached the same diagnosis of Autism Spectrum Disorder, which does not manifest itself other than in "subtle motoric behaviors." *Id.* As for his symptoms of psychosis, Dr. O'Brien believes Defendant only experiences these during moments of meditation and therefore does not diagnose him with schizophrenia as Dr. Voskanian had. *Id.* at 19. Dr. O'Brien also testified at the hearing on August 30, 2018, and maintained his opinion although he did not again interview Defendant. During testimony, Dr. O'Brien talked about Defendant's belief of having another life and believes Defendant cannot separate television shows and video games from reality, but again states these delusions only occur during periods of meditation. Defendant told Dr. O'Brien that he met with as personal trainer regularly, is very spiritual, meditates regularly, and met with a psychic weekly. Dr.

5

O'Brien finds the presence of rationality due to his exculpatory statements. Unlike Dr. Voskanian, Dr. O'Brien finds that Defendant's defense of no fingerprints and stating that he told police he killed Victim, not because it was the truth but because he was scared, shows his ability to rationally think and assist in his defense. Dr. O'Brien agrees that Defendant has severe and long-term autism, but does not agree that he cannot rationally assist in his defense due to this.

### Dr. John Northrop's Report

Dr. Northrop filed his report in response to this Court's order on July 9, 2017, following an interview with Defendant on July 7, 2017. The report is based off of an interview that was approximately one and a half (1 ½) hours and multiple documents outlining this incident and Defendant's history. Dr. Northrop Evaluation's 09/09/17, at 1. During Dr. Northrop's interview Defendant revealed the following: Defendant stated he went to private school where he was in special education classes due to his autism diagnosis; His mother and father divorced when he was in junior high and his stepfather abused him; He attended Northern Virginia Community College where he studied for a few semesters but stopped due to dropping grades; and He had trouble keeping a job and was not in a romantic relationship, but stated he dated women in the past. *Id.* at 2.

Defendant told Dr. Northrop when he was first diagnosed with autism he would "get overstimulated and confused especially if more than one person [was] talking. [He's] impulsive and slow with a poor memory." *Id.* at 3. In the past, Defendant recalled feeling depressed three or four times a month. *Id.* at 4. He also told Dr. Northrop he struggled with social interactions. *Id.* Dr. Northrop also described what he believed to either be "psychosis or eccentric notions of someone with an autism spectrum disorder or personality disorder." *Id.*

6

Defendant believed himself an empath (he could feel other's emotions) that could feel the hatred from Washington D.C. following the election. *Id.* He also encountered spirit guides and alien life. *Id.* But he denied experiencing these things when not meditating with his YouTube videos. *Id.* Defendant stated he had experienced voices stating "Hail Satan," "Just give up," and "Depression" that he described as "thought forms." *Id.*

At the time of the interview, Dr. Northrop relayed Defendant still heard unfamiliar voices, but stated the medication was helping with this issue. *Id.* at 5. Defendant also denied any "contact" with aliens or spirit guides since incarceration, but still believes he has the ability to do so through meditation. *Id.* at 5, 7. Upon initial incarceration, Defendant had "suicidal ideations conditional on a life sentence" since he was aware that he is charged with homicide, but he has since denied this and maintains his innocence. *Id.* at 6.

Dr. Northrop observes that his anxiousness and oddities were consistent with a psychotic disorder, pervasive developmental disorder, and/or personality disorder. *Id.* at 7. Dr. Northrop reached the same conclusion as the other evaluators. Defendant understands the factual nature of the proceedings such as what he is charged with, that it is serious, the procedures and persons involved, and he can define their roles and define guilt. *Id.* at 7-8. Defendant explained to Dr. Northrop his options regarding whether to plea or go to trial. *Id.* at 8. Dr. Northrop reached the diagnosis that he has an "Unspecified Psychotic Disorder -- Evaluate for Schizophrenia vs. Autism Spectrum Disorder vs. Personality Disorder." *Id.* at 11. Further Dr. Northrop concluded:

> Nonetheless, at the present time he does not have any psychiatric symptoms, psychosis or cognitive deficits that are substantially impairing his capacity for legal proceedings. As described above, he has a sufficient rational and factual understanding of the proceedings against him. He is capable of assisting his attorney in his defense. His bizarre ideas or delusions do not directly impact upon his capacity for legal proceedings.

7

*Id.*

## Discussion

When a defendant "is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues." 50 P.S. § 7402(a). A defendant is presumed competent and it is their burden to prove otherwise. *Commonwealth v. Sanchez*, 907 A.2d 47, 490 (Pa. 2006). At a hearing on the issue, incompetency must be proven by a preponderance of the evidence. 50 P.S. § 7402(d). That is to say Defendant must prove that more likely than not he is incompetent. *Commonwealth v. Hughes*, 865 A.2d 761, 779 (Pa. 2004). "Competency is measured according to whether the defendant has sufficient ability at the pertinent time to consult with counsel with a reasonable degree of rational understanding, and to have a rational as well as a factual understanding of the proceedings." *Commonwealth v. Davido*, 106 A.3d 611, 639 (Pa. 2014) (citing *Commonwealth v. Uderra*, 862 A.2d 74, 88 (Pa. 2004)). A long history of mental illness is not dispositive of Defendant's ability to stand for trial. *See Commonwealth v. Tyson*, 402 A.2d 995 (Pa. 1979).

## Analysis

All three experts agree that Defendant has the requisite capacity to understand the factual nature of his criminal proceedings. This is demonstrated by his understanding of the roles of the prosecution, judge, jury, defense attorney, and his personal role in the proceedings. In addition, he understands the seriousness of the offense for which he is charged, his role as the defendant, and his options moving forward. The question and disagreement among the experts is Defendant's rational understanding and more specifically

8

his ability to assist his attorney in his defense. *See* Dr. Voskanian's Evaluation 10/17/17, at 33.

Defendant has the burden to prove more likely than not that he is incompetent. *Hughes*, 865 A.2d at 779. He has not met that burden. Both Dr. Northrop and Dr. O'Brien concluded that Defendant was capable of adequately assisting his attorney in his own defense. One sign of his competency that stuck out to the Court was the consistency with which he detailed the incident to all three evaluators. In each account, although almost a year apart, he recounts: leaving for Canada to get a fresh start, riding his bike to Williamsport, being tired, exhausted, and hungry, breaking a window with a shovel to enter a home that he thought was abandoned, finding a dead body inside, before leaving taking coins because he needed them, and then taking the car outside to finish his trip to Canada. Dr. Voskanian's Evaluation 10/17/17, at 11; Dr. O'Brien's Evaluation 08/20/18, at 18; Dr. Northrop's Evaluation 09/09/17, at 13-14. One of Dr. Voskanian's original concerns was Defendant's anxiety and rigidness during their interview, but at the hearing Dr. Voskanian stated that the medication did make him more complacent and easier to have a conversation with. *See* Dr. Voskanian's Evaluation 10/17/17, at 10. In addition, Dr. Voskanian stated that Defendant was "highly suggestible" which meant he would not be able to keep to one version of events, but based on the version of events he has stated thus far it has not been a problem. *Id.* Also during testimony Dr. Voskanian contradicted this point by stating Defendant will not let go of this idea that his fingerprints are not on the shovel, therefore he cannot be convicted. If he was as highly suggestible as Dr. Voskanian states then this would not be the case. Dr. Voskanian also states that his strong belief that he cannot be prosecuted due to a lack of fingerprints shows

9

his lack of rational competency, but this Court disagrees. Regardless of whether this is a poor defense or not, it is still a rational defense.

More evidence of his rational competency is demonstrated in his reasoning for why he gave an alleged confession to police officers. Defendant stated he "had a mental breakdown" and he "told them what they wanted to hear." Dr. Voskanian's Evaluation 10/17/17, at 8. This was due to the fact he was "exhausted, tired, hungry," and not thinking. *Id.* Whether true or false, this shows rational competency of a common confession defense. The Court also finds the fact that he lived on his own and took care of himself for an extended period of time prior to the incident, as well as the fact he recounted his history to all three evaluators in a similar fashion without any major alterations shows evidence of competency.

The most important and troubling information presented is Defendant's potential moments of psychosis. This includes his beliefs about his "twin flame," his belief he was a "fire breathing dragon," ability to see past lives, and him being an empath. *Id.* at 5-6, 10. Dr. Voskanian views this phenomena as a slipping back and forth from reality to reality, which would seriously impair Defendant's competency in dealing with rational aspects of his defense. Dr. O'Brien identified this as "evidence of psychosis" that was only experienced "during periods of daily meditation." Dr. O'Brien's Evaluation 08/20/18, at 19. He does not deny the validity of Defendant's beliefs or that they are not prevalent just that they would not affect the legal proceedings because he has not experienced them since his period of incarceration and they only occur during periods of meditation. Dr. Northrop also finds evidence of psychosis that could be associated with schizophrenia as did Dr. Voskanian, but like Dr. O'Brien he finds that "[h]is bizarre ideas or delusions do not directly impact upon his capacity for legal proceedings." Dr. Northrop's Evaluation 09/09/17, at 13-14. Through his

10

investigation, he found meditation to also be the root or trigger of much of his psychosis. *Id.* at 4.

**Conclusion**

Based upon the testimony of Dr. Voskanian and Dr. O'Brien, as well as their reports in addition to Dr. Northrop's report, this Court finds that Defendant has not met his burden to show his incompetence. Defendant specifically has not proven by a preponderance of the evidence that the psychosis which would hinder his defense occurs at times other than when he is meditating. Since Defendant is presumed competent and a long history of mental illness is not dispositive of his ability to stand trial, Defendant is found competent to stand trial for the charges being brought by the Commonwealth.

**ORDER**

**AND NOW**, this ___ day of October, 2018, based upon the foregoing Opinion, the Defendant's Omnibus Pretrial Motion is hereby DENIED.

By the Court,

Nancy L. Butts, President Judge

cc: DA
Robert Hoffa, Esquire

11